JjMARVIN, Chief Judge.
In this action for damages arising out of plaintiffs’ automobile being rear-ended by another vehicle, the plaintiffs, husband and wife, appeal, seeking to increase the award based on a jury verdict.
The judgment awarded Elizabeth Vander-kooi $20,000 general damages and past medical expenses of $11,649, subject to a credit of $10,682 paid by defendants, for a net special damage award of $967. Plaintiffs ask us to increase Mrs. Vanderkooi’s general damage award and to award her future medical expenses and to make a loss of consortium award to Mr. Vanderkooi.
Finding no clear abuse of the jury’s discretion on our review of the evidence in the light that most favorably supports the jury verdict, we affirm. See and compare Gladney v. May, 29,373 (La.App. 2d Cir.5/7/97), 697 So.2d 1022, writ denied; Wood v. Toys “R” Us, Inc., 28,667 (La.App. 2d Cir.9/25/96), 681 So.2d 49; and Phiratsamy v. Pipes, 27,209 (La.App. 2d Cir.8/23/95), 660 So.2d 172.
FACTS
Mrs. Vanderkooi, alone in her Chevrolet van, stopped at a stop sign at a Shreveport intersection. Sewell, in his employer’s three-ton truck, initially stopped behind the van but drove slowly forward into the rear of the van on the mistaken assumption that it was entering the intersection ahead of him. Se-well and his employer, Paul Lashley Supply Co., have not appealed that part of the judgment that finds Mrs. Vanderkooi free of fault.

Injuries

Mrs. Vanderkooi, the 34-year-old wife of an Air Force staff sergeant and working mother of a two-year-old child at the time of the accident, suffered immediate neck, back and shoulder pain which became chronic in spite of prompt medical and chiropractic treatment. She also developed headaches, insomnia andj^fatigue, all of which her doctors associated with the injuries she suffered in the accident.
In addition to these injuries, Mrs. Vander-kooi developed left hip bursitis and cárpal tunnel syndrome in her right wrist after the accident. These conditions were not causally tied to the accident by the medical evidence in this record.

*606
Medical Treatment

Mrs. Vanderkooi’s accident-related symptoms appeared to worsen with chiropractic treatment in the first month after the accident, February 1995, and did not improve with drug and physical therapy treatment respectively prescribed by her internist in March and by her orthopedist from March-May.
In May 1995, about four months after the accident and on referral by her orthopedist, Mrs. Vanderkooi began seeing a rheumatolo-gist, Dr. Pressly, who diagnosed her with a “fibromyalgia-like syndrome” involving chronic muscular pain at various “trigger points” throughout the body, though not enough for her to be formally diagnosed with fibromyalgia, which requires at least 11 trigger points out of a possible 18.
According to Dr. Pressly, the number and location of a patient’s trigger points are objectively verifiable: the patient “hits the ceiling ... [when] you push on them. They actually have what’s known as a jump sign, and so this is an objective test for disorders like this.” On most of her 15 visits to Dr. Pressly from 1995-1997, Mrs. Vanderkooi had between three and five trigger points in her neck, back and shoulders. The number occasionally increased to eight or more, once in May 1995 and again in May 1997.
In December 1995, Mrs. Vanderkooi underwent MRI examinations of the cervical, thoracic and lumbar spine which revealed no disc abnormalities. She ftcontinued her treatment with Dr. Pressly thereafter and was still seeing him at the time of trial in August 1997.

Daily Activities

Mrs. Vanderkooi continued her full-time job as an administrative assistant for about a year after the accident. Notwithstanding her testimony that her injuries from the accident caused her to work more slowly and in pain, Mrs. Vanderkooi never took time off from work because of her pain, even when she was “real sore and very stiff’ in the first week after the Friday afternoon accident. The only work time she missed was for her medical appointments. A part-time clerical worker who worked closely with Mrs. Van-derkooi observed that Mrs. Vanderkooi appeared to be working in pain after the accident but recalled no specific work tasks or duties that Mrs. Vanderkooi was unable to perform.
In September 1995, Mrs. Vanderkooi reported to Dr. Pressly continuing upper back pain which disturbed her sleep, saying she had “minimal time to relax [because] she went straight from work to soccer practice and was home at about [8:00 p.m.]. At that point she fixed dinner, ... had [her son] take [his] bath and ... put [him] to bed.” Our brackets. Dr. Pressly recommended that she begin a regular exercise program such as walking and that she “consider performing some hobbies to try and reduce the stress that she had in her life.” He repeated these recommendations on subsequent visits.
Notwithstanding Mrs. Vanderkooi’s testimony that walking was one of her hobbies before the accident, her walks became shorter and less frequent after the accident. She told the jury, “I have to go slower [now] because if I don’t, it aggravates my back.”
| Second Pregnancy
In early 1996, about a year after the accident, Mrs. Vanderkooi became pregnant with her second child and stopped using all prescription medication until after the birth of her son in November 1996, taking only Extra Strength Tylenol for her pain. She continued to see Dr. Pressly, albeit less frequently, during 1996, presenting with three trigger points in the neck, back and shoulders in April and six in August. Dr. Pressly opined that the hormonal changes associated with pregnancy may have helped Mrs. Vanderkooi tolerate the pain without prescription drugs. Mrs. Vanderkooi testified she experienced some relief of her symptoms while she was pregnant, as Dr. Pressly expected, but said she continued to have “good days and bad days.”
Mrs. Vanderkooi lost her job around the time she became pregnant, apparently for reasons unrelated to the accident. The decrease in her activity level also caused her to feel better, at least initially, according to Dr. Pressly’s notes of the April 1995 visit.
*607 In the fall of 1996, when Mrs. Vanderkooi was eight months pregnant, she and her family traveled by car to Wisconsin to attend a family wedding, a distance of more than 900 miles each way, notwithstanding Mrs. Vanderkooi having repeatedly told her doctors that prolonged sitting made her pain worse. Mrs. Vanderkooi used a special back cushion during the long drive and said she made the trip only “with the stipulation that we had to stop every hour to allow me to walk.”
While driving on a Wisconsin highway, Mr. Vanderkooi swerved the van in an unsuccessful attempt to avoid hitting a deer. The impact damaged the van’s front right quarter panel and light assembly, according to Mr. Vanderkooi. Mrs. |5Vanderkooi said she suffered no ill effects from the impact, explaining that the deer was “very small ... it was like hitting a dog.”
The Vanderkoois drove to Wisconsin again in July 1997, about a month before trial, to allow an elderly relative to see their infant son. On her July 22 visit to Dr. Pressly, Mrs. Vanderkooi reported that her pain was worse from a combination of the long drive, the stress associated with her recent return to work, the upcoming trial, and the fact that she “stayed constantly busy.” Her husband had recently been overseas for several months, leaving her to take care of the children, the rural family home and a small herd of beef cattle alone or with help from relatives and friends. Mrs. Vanderkooi spent an hour a day driving to and from work, 30 minutes each way.
Throughout her treatment with Dr. Pressly, Mrs. Vanderkooi consistently reported that her neck, back and shoulder pain caused her to wake up several times each night. For a few months after her second child’s birth in November 1996, she reported being “up with the baby” at night. Her sleep interruptions continued even after the child began sleeping through the night, however, causing Dr. Pressly to relate them to her chronic pain.

Mr. Vanderkooi’s Testimony

Mr. Vanderkooi was away on another military assignment when the case was tried in August 1997. The jury heard his testimony via videotaped deposition taken a few weeks before trial.
Mr. Vanderkooi corroborated his wife’s testimony that her pain from the accident frequently disturbs her sleep and makes it hard for her to tolerate holding either of her children and playing or “wrestling” with the four-year-old. Mr. Vanderkooi now does more housecleaning, laundry and child care than he did before the accident, but his wife still does all the cooking and ironing. Her ^household responsibilities increase when he is away on assignment, as he was at the time of the accident and at trial.
Mr. Vanderkooi described how the accident has affected his physical intimacy with his wife:
It has decreased compared to what it used to be prior to the accident. We would be intimate pretty much all week long; whereas, now maybe three, two or three times a week, and the duration of it is,, we have to stop.

Future Medical Treatment

Dr. Pressly testified that the medications currently available to treat the pain, muscle spasms, fatigue and sleep disorders associated with fibromyalgia-like conditions had offered some relief to Mrs. Vanderkooi but had not totally alleviated her symptoms. While agreeing that she is not “disabled” as that term is medically defined, he opined that her condition will continue to limit or “impair” her ability to tolerate repetitive physical activity and any type of mental stress.
Dr. Pressly does not expect Mrs. Vander-kooi’s prognosis to improve until at least age 60-65, when her physical activity and stress levels would naturally begin declining with age. Mrs. Vanderkooi was 37 years old at trial. To keep her symptoms from worsening, Mrs. Vanderkooi will need to continue taking her present medications and making at least four doctor visits each year for the next 20 or more years, according to Dr. Pressly.
Mrs. Vanderkooi’s average drug expense at the time of trial was $241 per month or about $2,900 per year. The office visits will *608 cost another $220 per year. These amounts, projected over the next 23-28 years to age 60 or 65 respectively, yield an estimated total future medical expense of $71,700-87,300.

Other Evidence

Mrs. Vanderkooi did not tell Dr. Pressly about two prior automobile accidents she was involved in about ten years before this accident: one in July |71984 and the other in October 1984. Her internist, Dr. Biekham, was already aware of these accidents, having treated her for complaints of pain in her neck, left shoulder and left arm after the first accident and for left shoulder and elbow pain after the second. In May 1985, when Mrs. Vanderkooi reported occasional radiation of her neck pain into her left wrist and hand, Dr. Biekham referred her to Dr. Harold Bicknell, an orthopedic surgeon whose son later treated Mrs. Vanderkooi for the 1995 injuries at issue here. Mrs. Vanderkooi continued to see Dr. Harold Bicknell until September 1985, when she reported some improvement of her neck pain with physical therapy. The doctor recommended, but had no record of, another follow-up visit.
Mrs. Vanderkooi said she “didn’t think about” the 1984 accidents when she gave Dr. Pressly her medical history in May 1995. Dr. Pressly considered any prior neck trauma to be a “significant” fact in a patient’s history, something he “would have wanted” Mrs. Vanderkooi to tell him about. He was not squarely asked whether or how the additional history may have affected his assessment of Mrs. Vanderkooi’s condition.
Even before the 1984 accidents, Mrs. Van-derkooi had complained to Dr. Biekham of neck and shoulder pain in January 1984, giving no history of trauma for her symptoms. After mentioning this “unexplained” neck pain in her pre-trial deposition, Mrs. Vanderkooi told the jury she “didn’t recall” having any prior neck pain apart from the 1984 accidents.
Mrs. Vanderkooi testified she had completely recovered from her prior neck and shoulder injuries before the 1995 accident. She continued to see Dr. Biekham for other medical problems from 1986-1988 without making any further neck or shoulder complaints. Moving to California with her husband in 1990, she next saw Dr. Biekham for chest pain and abdominal pain in August 1994, shortly after |8the couple’s return to Louisiana. Neither litigant produced any records of her medical treatment or condition while in California, 1990-1994.
Mrs. Vanderkooi told the jury that her neck, back and shoulder pain from the 1995 accident was “about three hundred times worse” than the pain she suffered after the 1984 accident. She said her present pain has “drastically changed” the way she fives her life, explaining that she “trudges on” with her daily activities and duties at home and at work “because [she has] to.” Our brackets.
Notwithstanding that the combined speed of both vehicles in the 1995 collision was found to be no more than 5 mph, Mrs. Van-derkooi described the force of the collision as “pretty hard,” saying Sewell’s truck “slammed into the back of me.” She also recalled having told Sewell and the investigating police officer:
You know how a lot of people claim whiplash right after a wreck. I’m not trying to do that. Fm just letting you know that my back is hurting and I’m going to go to the base hospital just to get it checked out.
The investigating officer noted in his report that Mrs. Vanderkooi complained of back pain at the scene and declined his offer of emergency medical assistance. Sewell said his only discussion with Mrs. Vanderkooi about her physical condition consisted of him asking her whether she “was okay” and her replying that she “was fine.” He denied having heard her mention back pain to him or to the police officer.
DISCUSSION
The jury awarded Mrs. Vanderkooi the full amount of her past medical expenses, most of which had already been paid by the defendants, but made no award for future medical expenses. The jury’s $20,000 general damage award includes both past and future damages, according to the jury interrogatories. While a different trier of fact might have awarded more in general damages and |9might have made some award for future medicals, we do not find a clear abuse of *609 discretion in this jury’s treatment of those claims, or in the jury’s denial of any recovery for loss of consortium, considering the evidence we have summarized.
In assessing either or both general and special damages for a particular injury or loss, a jury is not bound to accept the entirety of the testimony of any witness, lay or expert, nor the plaintiffs perception of the degree and magnitude of his or her injury or loss. Phimtsamy, Wood, Gladney, all cited supra.
On this record, the jury could have reasonably concluded that some of Mrs. Vanerkooi’s complaints and limitations were not causally related to the accident, arising from either or both her chronic hip and wrist pain, which her doctors did not attribute to the accident, and the normal stress and strain of being a full-time working mother of two small children. While Mrs. Vanderkooi’s accident-related neck, back and shoulder pain clearly had some effect on her daily activities and her quality of life, the jury could have reasonably found that her characterization of those effects as “drastic” was exaggerated. This, in turn, undermines Dr. Pressly’s opinion of the need for and the expected duration of her future medical care.
The record similarly supports the jury’s conclusion that Mrs. Vanderkooi’s injuries from the accident did not cause her husband any appreciable loss of consortium. We cannot find that the jury abused its discretion.
DECREE
At plaintiffs’ cost, the judgment is AFFIRMED.